Justice Auto
delivered the opinion of the Court.
The attorney-client privilege ranks among the oldest and most established evidentiary privileges known to our law. The common law, however, has recognized an exception to the privilege when a trustee obtains legal advice related to the exercise of fiduciary duties. In such cases, courts have held, the trustee cannot withhold attorney-client communications from the beneficiary of the trust.
In this case, we consider whether the fiduciary exception applies to the general trust relationship between the United States and the Indian tribes. We hold that it does not. Although the Government’s responsibilities with respect to the management of funds belonging to Indian tribes bear some resemblance to those of a private trustee, this analogy cannot be taken too far. The trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law, and in fulfilling its statutory duties, the Government acts not as a private trustee but pursuant to its sovereign interest in the execution of federal law. The reasons for the fiduciary exception — that *166 the trustee has no independent interest in trust administration, and that the trustee is subject to a general common-law duty of disclosure — do not apply in this context.
I
The Jicarilla Apache Nation (Tribe) occupies a 900,000-acre reservation in northern New Mexico that was established by Executive Order in 1887. The land contains timber, gravel, and oil and gas reserves, which are developed pursuant to statutes administered by the Department of the Interior. Proceeds derived from these natural resources are held by the United States in trust for the Tribe pursuant to the American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, and other statutes.
In 2002, the Tribe commenced a breach-of-trust action against the United States in the Court of Federal Claims (CFC). The Tribe sued under the Tucker Act, 28 U. S. C. § 1491 (2006 ed. and Supp. Ill), and the Indian Tucker Act, §1505, which vest the CFC with jurisdiction over claims against the Government that are founded on the Constitution, laws, treaties, or contracts of the United States. The complaint seeks monetary damages for the Government’s alleged mismanagement of funds held in trust for the Tribe. The Tribe argues that the Government violated various laws, including 25 U. S. C. §§ 161a and 162a, that govern the management of funds held in trust for Indian tribes. See 88 Fed. Cl. 1, 3 (2009).
From December 2002 to June 2008, the Government and the Tribe participated in alternative dispute resolution in order to resolve the claim. During that time, the Government turned over thousands of documents but withheld 226 potentially relevant documents as protected by the attorney-client privilege, the attorney work-product doctrine, or the deliberative-process privilege.
In 2008, at the request of the Tribe, the case was restored to the active litigation docket. The CFC divided the case *167 into phases for trial and set a discovery schedule. The first phase, relevant here, concerns the Government’s management of the Tribe’s trust accounts from 1972 to 1992. The Tribe alleges that during this period the Government failed to invest its trust funds properly. Among other things, the Tribe claims the Government failed to maximize returns on its trust funds, invested too heavily in short-term maturities, and failed to pool its trust funds with other tribal trusts. During discovery, the Tribe moved to compel the Government to produce the 226 withheld documents. In response, the Government agreed to withdraw its claims of deliberative-process privilege and, accordingly, to produce 71 of the documents. But the Government continued to assert the attorney-client privilege and attorney work-product doctrine with respect to the remaining 155 documents. The CFC reviewed those documents in camera and classified them into five categories: (1) requests for legal advice relating to trust administration sent by personnel at the Department of the Interior to the Office of the Solicitor, which directs legal affairs for the Department, (2) legal advice sent from the Solicitor’s Office to personnel at the Interior and Treasury Departments, (3) documents generated under contracts between Interior and an accounting firm, (4) Interior documents concerning litigation with other tribes, and (5) miscellaneous documents not falling into the other categories.
The CFC granted the Tribe’s motion to compel in part. The CFC held that communications relating to the management of trust funds fall within a “fiduciary exception” to the attorney-client privilege. Under that exception, which courts have applied in the context of common-law trusts, a trustee who obtains legal advice related to the execution of fiduciary obligations is precluded from asserting the attorney-client privilege against beneficiaries of the trust. The CFC concluded that the trust relationship between the United States and the Indian tribes is sufficiently analogous *168 to a common-law trust relationship that the exception should apply. Accordingly, the CFC held, the United States may not shield from the Tribe communications with attorneys relating to trust matters.
The CFC ordered disclosure of almost all documents in the first two categories because those documents “involve matters regarding the administration of tribal trusts, either directly or indirectly implicating the investments that benefit Jicarilla” and contain “legal advice relating to trust administration.” Id., at 14-15. The CFC allowed the Government to withhold most of the documents in the remaining categories as attorney work product,[1] but the court identified some individual documents that it determined were also subject to the fiduciary exception. Id., at 18-19.
The Government sought to prevent disclosure of the documents by petitioning the Court of Appeals for the Federal Circuit for a writ of mandamus directing the CFC to vacate its production order. The Court of Appeals denied the petition because, in its view, the CFC correctly applied the fiduciary exception. The court held that “the United States cannot deny an Indian tribe’s request to discover communications between the United States and its attorneys based on the attorney-client privilege when those communications concern management of an Indian trust and the United States has not claimed that the government or its attorneys considered a specific competing interest in those communications.” In re United States, 590 F. 3d 1305, 1313 (CA Fed. 2009). In qualifying its holding, the court recognized that sometimes the Government may have other statutory obligations that clash with its fiduciary duties to the Indian tribes. But because the Government had not alleged that the legal advice in this case related to such conflicting interests, the *169 court reserved judgment on how the fiduciary exception might apply in that situation. The court rejected the Government’s argument that, because its duties to the Indian tribes were governed by statute rather than the common law, it had no general duty of disclosure that would override the attorney-client privilege. The court also disagreed with the Government’s contention that a case-by-case approach made the attorney-client privilege too unpredictable and would impair the Government’s ability to obtain confidential legal advice.
We granted certiorari, 562 U. S. 1128 (2011),[2] and now reverse and remand for further proceedings.
II
The Federal Rules of Evidence provide that evidentiary-privileges “shall be governed by the principles of the common law ... in the light of reason and experience.” Fed. Rule Evid. 501. The attorney-client privilege “is the oldest of the privileges for confidential communications known to the common law.” Upjohn Co. v. United States, 449 U. S. 383, 389 (1981) (citing 8 J. Wigmore, Evidence § 2290 (J. Me-Naughton rev. 1961)). Its aim is “to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. ” 449 U. S., at 389; Hunt v. Blackburn, 128 U. S. 464, 470 (1888).
The objectives of the attorney-client privilege apply to governmental clients. “The privilege aids government en *170 tities and employees in obtaining legal advice founded on a complete and accurate factual picture.” 1 Restatement (Third) of the Law Governing Lawyers §74, Comment b, pp. 573-574 (1998). Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys. Id., at 574 (“[Gjovernmental agencies and employees enjoy the same privilege as nongovernmental counterparts”). The Tribe argues, however, that the common law also recognizes a fiduciary exception to the attorney-client privilege and that, by virtue of the trust relationship between the Government and the Tribe, documents that would otherwise be privileged must be disclosed. As preliminary matters, we consider the bounds of the fiduciary exception and the nature of the trust relationship between the United States and the Indian tribes.
A
English courts first developed the fiduciary exception as a principle of trust law in the 19th century. The rule was that when a trustee obtained legal advice to guide the administration of the trust, and not for the trustee’s own defense in litigation, the beneficiaries were entitled to the production of documents related to that advice. Wynne v. Humberston, 27 Beav. 421, 423-424, 54 Eng. Rep. 165,166 (1858); Talbot v. Marshfield, 2 Dr. & Sm. 549, 550-551, 62 Eng. Rep. 728, 729 (1865). The courts reasoned that the normal attorney-client privilege did not apply in this situation because the legal advice was sought for the beneficiaries’ benefit and was obtained at the beneficiaries’ expense by using trust funds to pay the attorney’s fees. Ibid.; Wynne, supra, at 423-424, 54 Eng. Rep., at 166.
The fiduciary exception quickly became an established feature of English common law, see, e. g., In re Mason, 22 Ch. D. 609 (1883), but it did not appear in this country until the following century. American courts seem first to have ex *171 pressed skepticism. See In re Prudence-Bonds Corp., 76 F. Supp. 643, 647 (EDNY 1948) (declining to apply the fiduciary exception to the trustee of a bondholding corporation because of the "important right of such a corporate trustee ... to seek legal advice and nevertheless act in accordance ■with its own judgment”). By the 1970’s, however, American courts began to adopt the English common-law rule. See Garner v. Wolfinbarger, 430 F. 2d 1093, 1103-1104 (CA5 1970) (allowing shareholders, upon a showing of “good cause,” to discover legal advice given to corporate management).[3]
The leading American case on the fiduciary exception is Riggs Nat. Bank of Washington, D. C. v. Zimmer, 355 A. 2d 709 (Del. Ch. 1976). In that case, the beneficiaries of a trust estate sought to compel the trustees to reimburse the estate for alleged breaches of trust. The beneficiaries moved to compel the trustees to produce a legal memorandum related to the administration of the trust that the trustees withheld on the basis of attorney-client privilege. The Delaware Chancery Court, observing that “American case law is practically nonexistent on the duty of a trustee in this context,” looked to the English eases. Id., at 712. Applying the common-law fiduciary exception, the court held that the *172 memorandum was discoverable. It identified two reasons for applying the exception.
First, the court explained, the trustees had obtained the legal advice as “mere representative^]” of the beneficiaries because the trustees had a fiduciary obligation to act in the beneficiaries’ interest when administering the trust. Ibid. For that reason, the beneficiaries were the “real clients” of the attorney who had advised the trustee on trust-related matters, and therefore the attorney-client privilege properly belonged to the beneficiaries rather than the trustees. Id., at 711-712. The court based its “real client” determination on several factors: (1) When the advice was sought, no adversarial proceedings between the trustees and beneficiaries had been pending, and therefore there was no reason for the trustees to seek legal advice in a, personal rather than a, fiduciary capacity; (2) the court saw no indication that the memorandum was intended for any purpose other than to benefit the trust; and (B) the law firm had been paid out of trust assets. That the advice was obtained at the beneficiaries’ expense was not only a “significant factor” entitling the beneficiaries to see the document but also “a strong indication of precisely who the real clients were.” Id., at 712. The court distinguished between “legal advice procured at the trustee’s own expense and for his own protection,” which would remain privileged, “and the situation where the trust itself is assessed for obtaining opinions of counsel where interests of the beneficiaries are presently at stake.” Ibid. In the latter case, the fiduciary exception applied, and the trustees could not withhold those attorney-client communications from the beneficiaries.
Second, the court concluded that the trustees’ fiduciary duty to furnish trust-related information to the beneficiaries outweighed their interest in the attorney-client privilege. “The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship,” the court explained, “is here ultimately more important than the protection of the *173 trustees’ confidence in the attorney for the trust.” Id., at 714. Because more information helped the beneficiaries to police the trustees’ management of the trust, disclosure was, in the court’s judgment, “a weightier public policy than the preservation of confidential attorney-client communications.” Ibid.
The Federal Courts of Appeals apply the fiduciary exception based on the same two criteria. See, e. g., In re Long Island Lighting Co., 129 F. 3d 268, 272 (CA2 1997); Wachtel v. Health Net, Inc., 482 F. 3d 225, 233-234 (CA3 2007); Solis v. Food Employers Labor Relations Assn., 644 F. 3d 221, 227-228 (CA4 2011); Wildbur v. ARCO Chemical Co., 974 F. 2d 631, 645 (CA5 1992); United States v. Evans, 796 F. 2d 264, 265-266 (CA9 1986) (per curiam). Not until the decision below had a federal appellate court held the exception to apply to the United States as trustee for the Indian tribes.
B
In order to apply the fiduciary exception in this case, the Court of Appeals analogized the Government to a private trustee. 590 F. 3d, at 1313. We have applied that analogy in limited contexts, see, e. g., United States v. Mitchell, 463 U. S. 206, 226 (1983) (Mitchell II), but that does not mean the Government resembles a private trustee in every respect. On the contrary, this Court has previously noted that the relationship between the United States and the Indian tribes is distinctive, “different from that existing between individuals whether dealing at arm’s length, as trustees and beneficiaries, or otherwise.” Klamath and Moadoc Tribes v. United States, 296 U. S. 244, 254 (1935) (emphasis added). “The general relationship between the United States and the Indian tribes is not comparable to a private trust relationship.” Cherokee Nation of Okla. v. United States, 21 Cl. Ct. 565, 573 (1990) (emphasis added).
The Government, of course, is not a private trustee. Though the relevant statutes denominate the relationship *174 between the Government and the Indians a “trust,” see, e. g., 25 U. S. C. § 162a, that trust is defined and governed by statutes rather than the common law. See United States v. Navajo Nation, 537 U. S. 488, 506 (2003) (Navajo I) (“[T3he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions”). As we have recognized in prior cases, Congress may style its relations with the Indians a “trust” without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is “limited” or “bare” compared to a trust relationship between private parties at common law United States v. Mitchell, 445 U. S. 535, 542 (1980) (Mitchell I); Mitchell II, supra, at 224.[4]
The difference between a private common-law trust and the statutory Indian trust follows from the unique position of the Government as sovereign. The distinction between “public rights” against the Government and “private rights” between private parties is well established. The Government consents to be liable to private parties “and may yield this consent upon such terms and under such restrictions as it may think just.” Murray’s Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 283 (1856). This creates an important distinction “between eases of private right and those which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.” Crowell v. Benson, 285 U. S. 22, 50 (1932).
*175 Throughout the history of the Indian trust relationship, we have recognized that the organization and management of the . trust is a sovereign function subject to the plenary authority of Congress. See Merrion v. Jicarilla, Apache Tribe, 455 U. S. 130, 169, n. 18 (1982) (“The United States retains plenary authority to divest the tribes of any attributes of sovereignty”); United States v. Wheeler, 435 U. S. 313, 319 (1978) (“Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government”); Winton v. Amos, 255 U. S. 373, 391 (1921) (“Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property”); Lone Wolf v. Hitchcock, 187 U. S. 553, 565 (1903) (“Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government”); Cherokee Nation v. Hitchcock, 187 U. S. 294, 308 (1902) (“The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts”); see also United States v. Candelaria, 271 U. S. 432, 439 (1926); Tiger v. Western Investment Co., 221 U. S. 286, 315 (1911).
Because the Indian trust relationship represents an exercise of that authority, we have explained that the Government “has a real and direct interest” in the guardianship it exercises over the Indian tribes; “the interest is one which is vested in it as a sovereign.” United States v. Minnesota, 270 U. S. 181, 194 (1926). This is especially so because the Government has often structured the trust relationship to pursue its own policy goals. Thus, while trust administration “relat[es] to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United *176 States.” Heckman v. United States, 224 U. S. 413, 437 (1912); see also Candelaria, supra, at 443-444.
In Heckman, the Government brought suit to caneel certain conveyances of allotted lands by members of an Indian tribe because the conveyances violated restrictions on alienation imposed by Congress. This Court explained that the Government brought suit as the representative of the very Indian grantors whose conveyances it sought to cancel, and those Indians were thereby bound by the judgment. 224 U. S., at 445-446. But while it was formally acting as a trustee, the Government was in fact asserting its own sovereign interest in the disposition of Indian lands, and the Indians were precluded from intervening in the litigation to advance a position contrary to that of the Government. Id., at 445. Such a result was possible because the Government assumed a fiduciary role over the Indians not as a common-law trustee but as the governing authority enforcing statutory law.
We do not question “the undisputed existence of a general trust relationship between the United States and the Indian people.” Mitchell II, 463 U. S., at 225. The Government, following “a humane and self imposed policy..., has charged itself with moral obligations of the highest responsibility and trust,” Seminole Nation v. United States, 316 U. S. 286, 296-297 (1942), obligations “to the fulfillment of which the national honor has been committed,” Heckman, supra, at 437. Congress has expressed this policy in a series of statutes that have defined and redefined the trust relationship between the United States and the Indian tribes. In some cases, Congress established only a limited trust relationship to serve a narrow purpose. See Mitchell I, supra, at 544 (Congress intended the United States to hold land “'in trust’ ” under the General Allotment Act “simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation”); Navajo I, supra, at 507-508 (Indian Mineral Leasing Act imposes no *177 “detailed fiduciary responsibilities” nor is the Government “expressly invested with responsibility to secure ‘the needs and best interests of the Indian, owner’ ”).
In other cases, we have found that particular “statutes and regulations . . . clearly establish fiduciary obligations of the Government” in some areas. Mitchell II, supra, at 226; see also United States v. White Mountain Apache Tribe, 537 U. S. 465, 475 (2003). Once federal law imposes such duties, the common law “could play a role.” United States v. Navajo Nation, 556 U. S. 287, 301 (2009) (Navajo II). We have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed. See White Mountain Apache Tribe, supra, at 475-476. But the applicable statutes and regulations “establish [the] fiduciary relationship and define the contours of the United States’ fiduciary responsibilities.” Mitchell II, supra, at 224. When “the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated,... neither the Government’s ‘control’ over [Indian assets] nor common-law trust principles matter.” Navajo II, supra, at 302.[5] The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute.[6]
Over the years, we have described the federal relationship with the Indian tribes using various formulations. The Indian tribes have been called “domestic dependent nations,” Cherokee Nation v. Georgia, 5 Pet. 1, 17 (1831), under the “tutelage” of the United States, Heckman, supra, at 444, and subject to “the exercise of the Government’s guardianship over . . . their affairs,” United States v. Sandoval, 231 U. S. 28, 48 (1913). These concepts do not necessarily correspond *178 to a common-law trust relationship. See, e. g., Restatement 2d, § 7, at 22 (“A guardianship is not a trust”). That is because Congress has chosen to structure the Indian trust relationship in different ways. We will apply common-law trust principles where Congress has indicated it is appropriate to do so. For that reason, the Tribe must point to a right conferred by statute or regulation in order to obtain otherwise privileged information from the Government against its wishes.
Ill
In this ease, the Tribe’s claim arises from 25 U. S. C. §§ 161a-162a and the American Indian Trust Fund Management Reform Act of 1994, §4001 et seq. These provisions define “the trust responsibilities of the United States” with respect to tribal funds. §162a(d). The Court of Appeals concluded that the trust relationship between the United States and the Indian tribes, outlined in these and other statutes, is “sufficiently similar to a private trust to justify applying the fiduciary exception.” 590 F. Bd, at 1313. We disagree.
As we have discussed, the Government exercises its carefully delimited trust responsibilities in a sovereign capacity to implement national policy respecting the Indian tribes. The two features justifying the fiduciary exception — the beneficiary’s status as the “real client” and the trustee’s common-law duty to disclose information about the trust— are notably absent in the trust relationship Congress has established between the United States and the Tribe.
A
The Court of Appeals applied the fiduciary exception based on its determination that the Tribe rather than the Government was the “real client” with respect to the Government attorneys’ advice. Ibid. In cases applying the fiduciary exception, courts identify the “real client” based on whether the advice was bought by the trust corpus, whether *179 the trustee had reason to seek advice in a personal rather than a fiduciary capacity, and whether the advice could have been intended for any purpose other than to benefit the trust. Riggs, 355 A. 2d, at 711-712. Applying these factors, we conclude that the United States does not obtain legal advice as a “mere representative” of the Tribe; nor is the Tribe the “real client” for whom that advice is intended. See ibid.
Here, the Government attorneys are paid out of congressional appropriations at no cost to the Tribe. Courts look to the source of funds as a “strong indication of precisely who the real clients were” and a “significant factor” in determining who ought to have access to the legal advice. Id., at 712. We similarly find it significant that the attorneys were paid by the Government for advice regarding the Government’s statutory obligations.
The payment structure confirms our view that the Government seeks legal advice in its sovereign capacity rather than as a conventional fiduciary of the Tribe. Undoubtedly, Congress intends the Indian tribes to benefit from the Government’s management of tribal trusts. That intention represents “a humane and self imposed policy” based on felt “moral obligations.” Seminole Nation, 316 U. S., at 296-297. This statutory purpose does not imply a full common-law trust, however. Cf. Restatement 2d, §25, Comment b, at 69 (“No trust is created if the settlor manifests an intention to impose merely a moral obligation”). Congress makes such policy judgments pursuant to its sovereign governing authority, and the implementation of federal policy remains “distinctly an interest of the United States.” Heckman, 224 U. S., at 437.[7] We have said that “the United States contin *180 ue[s] as trustee to have an active interest” in the disposition of Indian assets because the terms of the trust relationship embody policy goals of the United States. McKay v. Kalyton, 204 U. S. 458, 469 (1907).
In some prior cases, we have found that the Government had established the trust relationship in order to impose its own policy on Indian lands. See Mitchell I, 445 U. S., at 544 (Congress “intended that the United States 'hold the land ... in trust' . . . because it wished to prevent alienation of the land”). In other cases, the Government has invoked its trust relationship to prevent state interference with its policy toward the Indian tribes. See Minnesota v. United States, 305 U. S. 382, 386 (1939); Candelaria, 271 U. S., at 442-444; United States v. Kagama, 118 U. S. 375, 382-384 (1886). And the exercise of federal authority thereby established has often been “left under the acts of Congress to the discretion of the Executive Department.” Heckman, supra, at 446. In this way, Congress has designed the trust relationship to serve the interests of the United States as well as to benefit the Indian tribes. See United States v. Rickert, 188 U. S. 432, 443 (1903) (trust relationship “ ‘authorizes the adoption on the part of the United States of such policy as their own public interests may dictate'” (quoting Choctaw Nation v. United States, 119 U. S. 1, 28 (1886))).[8]
*181 We cannot agree with the Tribe and its amici that “[t]he government and its officials who obtained the advice have no stake in [the] substance of the advice, beyond their trustee role,” Brief for Respondent 9, or that “the United States’ interests in trust administration were identical to the interests of the tribal trust fund beneficiaries,” Brief for National Congress of American Indians et al. as Amici Curiae 5. The United States has a sovereign interest in the administration of Indian trusts distinct from the private interests of those who may benefit from its administration. Courts apply the fiduciary exception on the ground that “management does not manage for itself.” Garner, 430 F. 2d, at 1101; Wachtel, 482 F. 3d, at 232 (“[0]f central importance in both Garner and Riggs was the fiduciary’s lack of a legitimate personal interest in the legal advice obtained”). But the Government is never in that position. While one purpose of the Indian trust relationship is to benefit the tribes, the Government has its own independent interest in the implementation of federal Indian policy. For that reason, when the Government seeks legal advice related to the administra,tion of tribal trusts, it establishes an attorney-client relationship related to its sovereign interest in the execution *182 of federal law. In other words, the Government seeks legal advice in a “personal” rather than a fiduciary capacity. See Riggs, 355 A. 2d, at 711.
Moreover, the Government has too many competing legal concerns to allow a case-by-case inquiry into the purpose of each communication. When “multiple interests” are involved in a trust relationship, the equivalence between the interests of the beneficiary and the trustee breaks down. Id., at 714. That principle applies with particular force to the Government. Because of the multiple interests it must represent, “the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary’s consent.” Nevada v. United States, 463 U. S. 110, 128 (1983).
As the Court of Appeals acknowledged, the Government may be obliged “to balance competing interests” when it administers a tribal trust. 590 F. 3d, at 1315. The Government may need to comply with other statutory duties, such as the environmental and conservation obligations that the Court of Appeals discussed. See id., at 1314-1315. The Government may also face conflicting obligations to different tribes or individual Indians. See, e. g., Nance v. EPA, 645 F. 2d 701, 711 (CA9 1981) (Federal Government has “conflicting fiduciary responsibilities” to the Northern Cheyenne and Crow Tribes); Hoopa Valley Tribe v. Christie, 812 F. 2d 1097, 1102 (CA9 1986) (“No trust relation exists which can be discharged to the plaintiff here at the expense of other Indians”). Within the bounds of its “general trust relationship” with the Indian people, we have recognized that the Government has “discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide.” Lincoln v. Vigil, 508 U. S. 182, 195 (1993); see also ibid. (“Federal Government ‘does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to all Indian tribes’ ” (quoting Hoopa *183 Valley Tribe, supra, at 1102». And sometimes, we have seen, the Government has enforced the trust statutes to dispose of Indian property contrary to the wishes of those for whom it was nominally kept in trust. The Government may seek the advice of counsel for ^guidance in balancing these competing interests. Indeed, the point of consulting counsel may be to determine whether conflicting interests are at stake.
The Court of Appeals sought to accommodate the Government’s multiple obligations by suggesting that the Government may invoke the attorney-client privilege if it identifies “a specific competing interest” that was considered in the particular communications it seeks to withhold. 590 F. 3d, at 1313. But the conflicting interests the Government must consider are too pervasive for such a case-by-case approach to be workable.
We have said that for the attorney-client privilege to be effective, it must be predictable. See Jaffee v. Redmond, 518 U. S. 1, 18 (1996); Upjohn, 449 U. S., at 393. If the Government were required to identify the specific interests it considered in each communication, its ability to receive confidential legal advice would be substantially compromised. The Government will not always be able to predict what considerations qualify as a “specific competing interest,” especially in advance of receiving counsel’s advice. Forcing the Government to monitor all the considerations contained in each communication with counsel would render its attorney-client privilege “little better than no privilege at all.” Ibid.
B
The Court of Appeals also decided the fiduciary exception properly applied to the Government because “the fiduciary has a duty to disclose all information related to trust management to the beneficiary.” 590 F. 3d, at 1312. In general, the common-law trustee of an irrevocable trust must produce trust-related information to the beneficiary on a reasonable *184 basis, though this duty is sometimes limited and may be modified by the settlor. Restatement (Third) of Trusts §82 (2005) (hereinafter Restatement 3d); Bogert §§962, 965.[9] The fiduciary exception applies where this duty of disclosure overrides the attorney-client privilege. United States v. Mett, 178 F. 3d 1058, 1063 (CA9 1999) (“[T]he fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle”).
The United States, however, does not have the same common-law disclosure obligations as a private trustee. As we have previously said, common-law principles are relevant only when applied to a “specific, applicable, trust-creating statute or regulation.” Navajo II, 556 U. S., at 302. The relevant statute in this case is 25 U. S. C. § 162a(d), which delineates “trust responsibilities of the United States” that the Secretary of the Interior must discharge. The enumerated responsibilities include a provision identifying the Secretary’s obligation to provide specific information to tribal *185 account holders: The Secretary must “suppl[y] account holders with periodic statements of their account performance” and must make “available on a daily basis” the “balances of their account.” §162a(d)(5). The Secretary has complied with these requirements by adopting regulations that instruct the Office of Trust Fund Management to provide each tribe with a quarterly statement of performance, 25 CFR § 115.801 (2010), that identifies “the source, type, and status of the trust funds deposited and held in a trust account; the beginning balance; the gains and losses; receipts and disbursements; and the ending account balance of the quarterly statement period,” § 115.803. Tribes may request more frequent statements or further “information about account transactions and balances.” § 115.802.
The common law of trusts does not override the specific trust-creating statute and regulations that apply here. Those provisions define the Government’s disclosure obligation to the Tribe. The Tribe emphasizes, Brief for Respondent 34, that the statute identifies the list of trust responsibilities as nonexhaustive. See §162a(d) (trust responsibilities “are not limited to” those enumerated). The Government replies that this clause “is best read to refer to other statutory and regulatory requirements” rather than to common-law duties. Brief for United States 38. Whatever Congress intended, we cannot read the clause to include a general common-law duty to disclose all information related to the administration of Indian trusts. When Congress provides specific statutory obligations, we will not read a “catchall” provision to impose general obligations that would include those specifically enumerated. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U. S. 134, 141-142 (1985). “As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.” Mackey v. Lanier Collection Agency & Service, Inc., 486 U. S. 825, 837 (1988). Reading the statute to incorporate the *186 fall duties of a private, common-law fiduciary would vitiate Congress’ specification of narrowly defined disclosure obligations.[10]
By law and regulation, moreover, the documents at issue in this case are classed “the property of the United States” while other records are “the property of the tribe.” 25 CFR §115.1000 (2010); see also §§15.502, 162.111, 166.1000. Just as the source of the funds used to pay for legal' advice is highly relevant in identifying the “real client” for purposes of the fiduciary exception, we consider ownership of the resulting records to be a significant factor in deciding who “ought to have access to the document.” See Riggs, 355 A. 2d, at 712. In this case, that privilege belongs to the United States.[11]
íf» *f»
Courts and commentators have long recognized that “[n]ot every aspect of private trust law can properly govern the *187 unique relationship of tribes and the federal government.” Cohen § 5.05[2], at 434-435. The fiduciary exception to the attorney-client privilege ranks among those aspects inapplicable to the Government’s administration of Indian trusts. The Court of Appeals denied the Government’s petition for a writ of mandamus based on its erroneous view to the contrary. We leave it for that court to determine whether the standards for granting the writ are met in light of our opinion.[12] We therefore reverse.the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

Justice Kagan
took no part in the consideration or decision of this case.

 The CFC held that there is no fiduciary exception to the work-product doctrine. 88 Fed. Cl. 1,12 (2009). The Court of Appeals did not address that issue, In re United States, 590 F. 3d 1305, 1313 (CA Fed. 2009), and it is not before us.

 After the Federal Circuit denied the Government’s mandamus petition, the Government produced the documento under a protective order that prevents disclosure to third parties until the case is resolved by this Court. App. to Pet. for Cert. 93a-97a. The Government’s compliance with the production order does not affect our review. Our decision may still pró-vido effective relief by preventing further disclooure and by excluding the evidence from trial. See Mohawk Industries, Inc. v. Carpenter, 558 U. S. 100, 109 (2009).

 Today, “[cjourto differ on whether the [attorney client] privilege io available for communications between the trustee and couneel regarding the administration of the trust.” A. Newman, 6. Bogert & G. Bogert, Law of Trusts and Trustees §962, p. 68 (3d ed. 2010) (hereinafter Bogert). Somo state courts have altogether rejected the notion that the attorney client privilege is subject to a fiduciary exception. See, e. g., Huie v. DeShazo, 922 S. W. 2d 920, 924 (Tex. 1996) (“The attorney-client privilege eervoG the Game important purpoao in the trustee-attorney relationship ao it does in other attorney-client relationships”); Wells Fargo Bank v. Superior Ct., 22 Cal. 4th 201, 208-209, 990 P. 2d 591, 595 (2000) (“[T]he attorney for the trustee of a trust is not, by virtue of this relationship, also the attorney for the bonofieiaricB of the trust” (internal quotation marks omit ted)). Neither party before this Court disputes the existence of a common law fiduciary exception, however, so in deciding this case wo ao sume such an exception exists.

 “There are a number of widely varying relationships which more or less closely resemble trusts, but which are not trusts, although tho term ‘trust’ is sometimes used loosely to cover oueh relationships. It is important to differentiate trusts from these other relationships, sinco many of the rules applicable to trusts are not applicable to them.” Restatement (Second) of Trusts §4, Introductory Note, p. 15 (1957) (hereinafter Restatement 2d); see also Begay v. United States, 16 Cl. Ct. 107, 127, n. 17 (1987) (“[T]he provisions relating to private trustees and fiduciaries, while useful as analogies, cannot be regarded as finally dispositive in a government — Indian trustee — fiduciary relationship”).

 Thus, the dissent’s reliance on the Government’s “managerial control,” post, at 194 (opinion of Sotomayor, J.), is misplaced.

 Cf. Restatement 2d, § 25, Comment a, at 69 (“(Ajlthough the settlor has called the transaction a trusty no trust is created unless he manifests an intention to impose duties which are enforceable in the courts”).

 Chief Justice Hughes, writing for a unanimous Court, insisted that the “national interest” in the management of Indian affairs “is not to be expressed in terms of proporty, or to bo limited to tho aoaertion of righto incident to the ownership of a reversion or to the holding of a technical title in trust.” Heckman, 224 U. S., at 487.

 Congreso has structured the trust relationship to reflect ita considered judgment about how the Indians ought to be governed. For example, the Indian General Allotment Act of 1887, 24 Stat. 388, was “a comprehensive congressional attempt to change the role of Indiano in Amorican society.” F. Cohen, Handbook of Federal Indian Law § 1.04, p. 77 (2005 ed.) (hereinafter Cohen). Congress aimed to promote the assimilation of Indians by dividing Indian lands into individually owned allotments. The federal policy aimed “to oubotituto a new individual way of life for the oidor Indian communal way.” Id., at 79. The Indian Reorganization Act of 1934, 48 Stat. 984, marked a shift away “from assimilation policies and toward more tolerance and rcopcct for traditional aopocto of Indian culture.” Cohen § 1.05, at 84. The Act prohibited further allotment and restored tribal *181 ownership. Id., at 86. The Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203, and the Tribal Self-Governance Act of 1994, 108 Stat. 4270, enabled tribes to run health, education, economic development, and social programs for themselves. Cohen § 1.07, at 103. This strengthened self-government supported Congress’ decision to authorize tribes to withdraw trust fundo from Federal Government control and place the funds under tribal control. American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4242-4244; see 25 U. S. C. §§4021-4029 (2006 ed. and Supp. III). The control over the Indian tribes that has been exercised by the United States pursuant to the trust relationship — forcing the division of tribal lands, restraining alienation — does not correspond to the fiduciary dutico of a common-law trustee. Rathor, the trust relationship has been altered and administered as an instrument of federal policy.

 We assume for the sake of argument that an Indian trust is properly analogized to an irrevocable tract rather than to a revocable trust. A revocable truat impooco no duty of the truotec to discloac information to the beneficiary. “[W]hile a trust is revocable, only the person who may revoke it is entitled to receive information about it from the trustee.” Bogert § 962, at 25, § 964; Restatement 3d, § 74, Comment e, at 31 (“[T]he trustee of a revocable trust io not to provide reporto or accounting3 or other information concerning the terms or administration of the trust to other beneficiaries without authorization either by the aettlor or in the terms of the trust or a statute”). In many respects, Indian trusts resem-blo revocable tracto at common law because Congreso has acted as the sottlor in establishing the tract and retains the right to alter the terms of tho trust by statute, even in derogation of tribal property interests. See Winton v. Amos, 255 U. S. 373, 391 (1921) (“It is thoroughly established that Congress has plenary authority over the Indians . . . and full power to lcgiolatc concerning their tribal property”); Cohen § 6.02[4], at 401 403. The Government has not advanced the argument that the relationship hero is similar to a revocable trust, and the point need not be addressed to resolve this case.

 Our reading of 25 U. S. C. § 162a(d) receives additional support from another statute in which Congress expressed its understanding that the Government retains evidentiary privileges allowing it to withhold information related to trust property from Indian tribes. The Indian Claims Limitation Act of 1982, 96 Stat. 1976, addressed Indian claims that the claimants desired to have litigated by the United States. If the Secretary of the Interior decided to reject a claim for litigation, he was required to furnish a report to the affected Indian claimants and, upon their request, to provide “any nonpriviloged research materials or evidence gathered by the United States in the documentation of such claim.” Id., § 5(b), at 1978. That Congress authorized the withholding of information on grounds of privilege makes us doubt that Congress understood the Government’s trust obligations to override so basic a privilege as that between attorney and client.

 The dissent tells us that applying the fiduciary exception is even more important against the Government than against a private trustee because of a “history of governmental mismanagement.” Post, at 208. While it is not nocoooary to our decision, we note that the Indian tribes are not required to keep their funds in federal trust. See 25 U. S. C. §4022 (authorizing tribes to withdraw funds held in trust by the United States); 25 CFR pt. 1200(B). If the Tribe wishes to have its funds managed by a “conventional fiduciary,” post, at 197, it may seek to do so.

 If the Court of Appeals declines to issue the writ, we assume that the CFC on remand will follow our holding here regarding the applicability of the fiduciary exception in the present context.