REYNA, Circuit Judge,
eoneurring-in-part and dissenting-in-part.
This case is ingrained in the intertwined, inextricable relationship between the American Indian and the United States. The question we are called to resolve is whether promises made to a small group of American Indians created obligations on the part of the United States that remain in effect. The majority looks primarily at the law and determines that the United States created no such obligations. I look at the both history and the law and find that the United States made certain promises of compensation that were memorialized by Congress in laws that it passed with the specific intent to create binding obligations to compensate the small band of American Indians. Because I believe those obligations remain in effect and provide a jurisdictional basis for appellants’ lawsuit against the United States, I respectfully dissent. I concur with the majority on the remaining issues.
I. HISTORICAL BACKGROUND
The majority glosses over key historical circumstances that are critical to interpret the 1888-1890 Appropriations Acts. My review begins and ends with those historical circumstances.
A. Broken Treaties and the Sioux Uprising
On September 29, 1837, the Sioux and the United States entered into a treaty whereby the Sioux agreed to cede to the United States all of their lands east of the Mississippi. In consideration, the United States’ agreed that it would invest $800,000 for the benefit of the Sioux. Under the Treaty, the United States was required to pay an annuity to the Sioux “forever.” Wolfchild v. United States, 96 Fed.Cl. 302, 312 (Fed.Cl.2010) (“Claims Court Remand Decision ”) (quoting Treaty of Sept. 29, 1837, arts. I—II, 7 Stat. 538). Thereafter, in subsequent treaties, the Sioux ceded lands in the territories of Minnesota and Iowa in exchange for the United States’ promise of “perpetual” peace and friendship. Id. (quoting Treaty of Aug. 5, 1851, arts. I—II, 10 Stat. 954 and Treaty of July 23, 1851, arts. II-IV, 10 Stat. 949).
As relevant for our purposes, the Mde-wakanton band was among the Sioux that entered into the treaties with the United States. By 1858, the Mdewakanton had agreed to occupy a reservation along the Minnesota River in south-central Minnesota. Id. (quoting Treaty of June 19, 1858, arts. I—III, 12 Stat. 1031).
In 1862, the Sioux revolted after the United States failed to furnish promised money and supplies under the terms of the treaties. The uprising resulted in the death of more than 500 white settlers and substantial property damage. Among other things, the United States viewed the revolt as a breach by the Sioux of the agreement to remain peaceful with the United States.
But not all Sioux broke the pledge to remain peaceful. Some of the Sioux, in particular a small number of the Mdewak-anton (the “Loyal Mdewakanton”), actively defended white settlers and were later *1296 credited as having saved white settlers’ lives.[1] The record is undisputed that at the risk of their own safety, the Loyal Mdewakanton prevented greater bloodshed and property damage. But the courageous acts of the Loyal Mdewakan-ton came with a price. Siding with the white settlers meant breaking away and severing ties with the Sioux tribe, including the Mdewakanton band.
In response to the Sioux uprising, the United States annulled its treaties with the Sioux, confiscated Sioux lands in Minnesota, and moved the Sioux west, outside the limits of then existing states. As for the Loyal Mdewakanton, their lands were confiscated along with all the other Sioux lands in Minnesota, and their annuity valued at approximately $1,000,000 was terminated. In addition, the Loyal Mdewakan-ton “could not return to their tribe ... or they would be slaughtered for the part they took in the outbreak.” Claims Court Remand Decision, 96 Fed.Cl. at 313 (quoting Cong. Globe, 38th Cong., 1st Sess. 3516 (1864)). As a result, the Loyal Mdewakan-ton were left isolated, poverty-stricken and homeless.
B. Congressional Efforts to Compensate the Loyal Mdewakanton
In 1863, Congress took its first action intended to compensate and reward the Loyal Mdewakanton for their loyalty during the Sioux uprising by enacting a statute that provided public lands to serve as “an inheritance to said Indians and their heirs forever.” Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 652, 654. Two weeks later, Congress passed a second statute that authorized the President to set apart agricultural lands for the Sioux who exerted themselves in rescuing the whites from massacre. See Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819. White settlers refused to permit any Sioux from resettling in Minnesota and became opposed the authorized land purchases. The two 1863 acts were never repealed, yet the Loyal Mdewakanton never realized the land benefits conferred under those acts.
In 1886, after conducting a census to establish which individuals had remained loyal to the United States during the Sioux uprising, Congress again attempted to provide the Loyal Mdewakanton with viable long-term relief. Congress enacted Appropriations Acts in 1888, 1889 and 1890 that included specific provisions for land proceeds to benefit the Loyal Mde-wakanton. In particular, the 1888-1890 Appropriations Acts memorialized Congress’s renewed efforts to provide relief to the destitute Loyal Mdewakanton.
In 1888, Congress appropriated $20,000 for the Department of the Interior (“Interior”) to purchase land, cattle, horses, and agricultural implements for the “fullblood” Loyal Mdewakanton. Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29 (“1888 Act”). In 1889, Congress appropriated an additional $12,000 for the Loyal Mdewak-anton. It also enacted a second Act that was substantially similar to the 1888 Act, but additionally required the Secretary of the Interior to expend the money equally among the Loyal Mdewakanton and mandated that any money not expended in one *1297 fiscal year be expended in a future fiscal year. Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93 (“1889 Act”).
The 1889 Act, like the 1888 Act, indicated that the appropriated funds should be used for the benefit of the Loyal Mdewak-anton. Id. More specifically, the 1889 Act used the imperative word “shall” to establish Interior’s duty with respect to specific appropriations and the Loyal Mdewakan-ton’s right to the money set aside for “lands, cattle, horses, implements, seeds, food, or clothing.” Id. The Act also established specific accounting procedures and eligibility requirements for the expenditure of funds. The 1889 Act reads in relevant part:
For the support of the full-blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, twelve thousand dollars, to be expended by the Secretary of the Interior ... Provided, That if the amount in this paragraph appropriated, or any portion of the sum appropriated for the benefit of these same Indians by said act of June twenty-ninth, eighteen hundred and eighty-eight, shall not be expended within the fiscal year for which either sum was appropriated, neither shall be covered into the Treasury, but shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians: And provided also, That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: And provided further, That as far as practicable lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality against his will.
Id. (emphases added).
The Act enacted in 1890, appropriating $8,000, is substantially similar to the earlier Acts, but also recognizes that the designated funds are for the support of full and mixed blood Loyal Mdewakanton who have “severed their tribal relations,” and as such “shall receive” the appropriated funds in as close to “an equal amount” as practicable. Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 (“1890 Act”).
Interior used the appropriated funds to purchase lands in three distinct areas of Minnesota. As the majority notes, in the years that followed, these three parcels of land developed into the three distinct communities of the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Community (“the three communities”). The United States now holds the lands in trust for the three communities, to which many descendants of the Loyal Mdewakanton do not belong.
II. The PREvious FedeRal CiRCuit Panel Decision
A panel of this Court previously held that the funds appropriated under the Appropriations Acts are subject to statutory use restrictions and did not create a trust or convey ownership rights in the lands *1298 purchased with those funds. See Wolfchild v. United States, 559 F.3d 1228, 1255 (Fed.Cir.2009) (“Wolfchild I ”). The panel, however, did not address the money-mandating issue before us today. Specifically, the Wolfchüd I panel explicitly declined to address whether it was lawful for Interior to transfer to the three communities the funds derived from the Mdewakanton lands:
The parties devote some attention to the question whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds. See Wolfchild I, 62 Fed.Cl. at 549-50. That issue does not affect our analysis of the two certified questions, however, and we leave that issue to be addressed, to the extent necessary, in further proceedings before the trial court.
Wolfchild I, 559 F.3d at 1259 n. 14 (emphases added). On remand, consistent with the guidance of this Court, the Wolfchüd plaintiffs amended their complaint to assert that the statutory use restrictions vested the class of plaintiffs with rights to pre-1980 revenues derived from the lands purchased for the benefit of the Loyal Mdewakanton.
The majority holds that the decision in Wolfchüd I decided and foreclosed the issue presented to us in this case. See Maj. Op. 1289-90. I disagree. It is clear to me that the Wolfchüd I panel explicitly decided not to reach the issue that is before us today and, indeed, cleared the way for the plaintiffs to amend the complaint to raise the issue. Wolfchild I, 559 F.3d at 1259 n. 14.
III. Analysis of Money-Mandating Duty
A. The Indian Tucker Act
The majority interprets the 1888-1890 Appropriations Acts as conferring the Secretary of the Interior with discretion on how to distribute the pre-1980 revenues derived from appropriated lands, a discretion that frees the United States from its promise to compensate the Loyal Mdewak-anton and their descendants. See Maj. Op. 1289-90. In my view, the text of the Acts, purpose of the Acts, and judicial recognition of the relationship between the government and the Tribes support the conclusion that the Acts “can be fairly interpreted” or are “reasonably amenable” to the interpretation that they mandate compensation by the government. See United States v. Navajo Nation, 556 U.S. 287, 290, 129 S.Ct. 1547, 173 L.Ed.2d 429 (2009) (citations omitted); United States v. White Mountain Apache Tribe, 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (clarifying that “a fair inference will do”). Here, there exists more than a fair inference that the 1888-1890 Acts impose a money-mandating duty on the government.
1. Plain Reading of the Appropriations Acts
I disagree that the Appropriations Acts’ grant of authority to the Secretary to generate leasing revenues cannot support a fair inference that, once revenues are generated, the Secretary had a duty to spend those revenues for the benefit of the Loyal Mdewakanton. See Maj. Op. at 1289-90. In my view, because the lands were purchased for the benefit of the Loyal Mdewakanton, any revenues generated from those lands necessarily belonged to the Loyal Mdewakanton.
Jurisdiction under the Indian Tucker Act is not limited to statutory schemes that leave the government “no discretion over payment of claimed funds.” Samish *1299 Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed.Cir.2005). Certain discretionary schemes may support claims if they provide clear standards for paying money to recipients. Id. (citations omitted). Here, the Appropriations Acts provide clear standards by directing the Secretary to spend the appropriated funds in a way such that each of the Loyal Mde-wakanton (who “have severed their tribal relations”) receives “an equal amount in value.” 1889 Act, 25 Stat. at 993; 1890 Act, 26 Stat at 349. The Acts also provide that, to the extent the appropriations were spent on land, the land “shall be purchased in such locality as each Indian desires.” Id.
Congress’s use of the word “shall” invokes a presumption that the provision is money mandating. See Greenlee County, Ariz. v. U.S., 487 F.3d 871, 877 (Fed.Cir.2007) (citations omitted). The majority ignores that the Appropriations Acts repeatedly use the word “shall” to convey, for example, that the funds “shall be so expended” for the benefit of the Loyal Mdewakanton, and that the recipients “shall receive” the funds in “equal amount[s].” See 25 Stat. at 992-93. This drafting choice implies that once certain condition precedents are met, the Secretary is expected to adhere to Congress’s directive. See Doe v. U.S., 463 F.3d 1314, 1325 (Fed.Cir.2006) (finding the source of law money-mandating where the statute used “shall”).
The majority concludes that the use restrictions do not extend to land revenues by equating the result to a trust, and that the Wolfchild I panel held the 1888-1890 Appropriations Acts did not create such a trust. See Maj. Op. at 1289-90; Wolfchild I, 559 F.3d at 1255. I agree with the Claims Court that our previous decision cannot be read to foreclose the issue of whether the use restrictions, without being considered a trust, can serve as the basis for a legitimate claim by the plaintiffs, particularly in view of the previous panel’s explicit warning that it was not deciding the issue. Claims Court Remand Decision, 96 Fed.Cl. at 328; Wolfchild I, 559 F.3d at 1259. “Only the issues actually decided — those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court — are foreclosed from further consideration.” Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1383 (Fed.Cir.1999) (citations omitted). Again, to be clear, the panel in Wolfchild I neither decided the issue of the applicability of the use restrictions to pre-1980 proceeds, nor foreclosed the issue, but expressly reserved it for consideration in later litigation involving the same parties.
Because the language of the Acts obligates the government to act for the benefit of the Loyal Mdewakanton, and the Wolfchild plaintiffs have alleged facts showing that the government failed to act on behalf of the Loyal Mdewakanton, I would affirm the Claim Court’s conclusion that the amended complaint states a viable claim for damages based on the statutory use restrictions on pre-1980 funds.[2]
2. Historical Context of the Appropriations Acts
The historical context of the 1888-1890 Appropriations Acts is useful in understanding the government’s obligations to *1300 the Loyal Mdewakanton. My review of the legislative history, internal memoranda reflecting Interior’s contemporaneous policy choices, and interpretive canons favoring protection for Native American claimants leads me to conclude that Congress intended the Appropriations Acts to provide a money-mandating duty. Where, as here, we have historical tools that illuminate Congress’s true intent in alleviating the plight of a displaced Tribal group, we should interpret the statutes taking into account the structure and underlying values of the scheme at the time it was enacted. See, e.g., Steelworkers v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (holding that the statute prohibiting racial discrimination must “be read against the background of the legislative history of Title VII and the historical context from which the Act arose”); District of Columbia v. Heller, 554 U.S. 570, 599-600, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (cautioning against ignoring the historical realities surrounding the right to bear arms at the time the Second Amendment was codified as a right).
First, the legislative history confirms that the overarching purpose of the 1888-1890 Appropriations Acts was to set aside resources that honor the sacrifices of the Loyal Mdewakanton following the Sioux uprising. For example, in 1888, 1889, and 1890, the proposed legislation was placed under the heading of “Fulfilling Treaty Stipulations with and Support of Indian Tribes,” rather than a more general “Miscellaneous” or “Miscellaneous Supports” heading. See Claims Court Remand Decision, 96 Fed.Cl. at 340 (citing 25 Stat. at 219; 25 Stat. at 982; 26 Stat. at 338). The Loyal Mdewakanton and their descendants were afforded a specific set of rights that constituted “replacements” for the “annuities and other benefits” the government had not delivered even after the Loyal Mdewakanton maintained their treaty obligations through a period of acute violence. See id. (recognizing the Appropriations Acts as “a substitution for the treaty benefits of which the Loyal Mdewakanton had been deprived.”).
Contemporaneous comments reveal that during the 1860s the Minnesota frontier had been so ablaze with negative sentiment following the Sioux uprising that no Tribal group — not even the steadfastly loyal — would collect their share of promised annuity funds.[3] Senator MacDonald, the sponsor of the 1888 Appropriation Act, aptly explained Congress’s intent in passing the Acts:
[A] few of ... [the Sioux] remained friendly to the whites and became their trusted allies and defenders, and ... a number of them did valuable service in protecting our people and their property, and in saving many lives.... They have ever since had claims upon not only our gratitude but that of the nation at large, which ought long ago to have been recognized and partially, at least, compensated for their invaluable services ... I am almost ashamed to say it, but the fact is that no exception [to the Act of Feb. 16, 1863] was made, even in favor of these friendly Indians.
Claims Court Remand Decision, 96 Fed.Cl. at 340-41 (quoting 19 Cong. Rec. 2,976-77 (1888)). Senator MacDonald’s statement of the bill’s purpose confirms that Congress passed the 1888-1890 Appropria *1301 tions Acts because the rights of the Loyal Mdewakanton were abruptly annulled and subsequent legislative efforts to remedy their misfortune were inadequate.
Second, the determination that the 1888-1890 Appropriations Acts are not money-mandating is contrary to the government’s own time-worn understanding that the land-use restrictions obliged the government to spend land proceeds for the benefit of the Loyal Mdewakanton. As the Claims Court pointed out, for the last 90 years, Interior has understood that if it were to assign the benefits of the lands to other Indians, there would be monetary repercussions for its breach in duties. See Claims Court Remand Decision, 96 Fed.Cl. at 341-42, 348.
For example, in 1933, Interior recognized that the land on which the three communities were situated “was land purchased for the Mdewakanton Sioux ... and their descendants. It has been and can be assigned only to such persons.” Id. at 344 (quoting Mem. From Charlotte T. Westwood to Joe Jennings, Indian Reorganization (approximately dated Nov. 27, 1933)) (emphasis added).[4] Also, in 1950, an attorney for Interior confirmed that the 1888-1890 Appropriations Acts excluded other Indian groups from monetary proceeds flowing from the restricted land:
In view of the provisions of the [Appropriations] Acts ... [the 1886 lands] may be assigned only to members of the Mdewakanton Band of Sioux Indians residing in Minnesota, and such assignee must have been a resident of Minnesota on May 20, 1886, or be a legal descendant of such resident Indian.
Claims Court Remand Decision, 96 Fed.Cl. at 344 (citing Mem. by Rex H. Barnes (July 24, 1950)); see also Mem. from Daniel S. Boos (Mar. 17, 1969) (“Based on independent research I have concluded that these remarks [the statements in the Barnes 1950 memorandum regarding the lineal descendants’ entitlement] are correct.”).
But the most telling statement — the one promulgated by Interior most recently — is a 1970 opinion by the Assistant Solicitor for Indian Legal Activities, who advised that the distributions that the government later made to the three communities would be unlawful:
[T]he land in question remains available only for the use of qualified Mdewakan-ton Sioux Indians. If it appears desirable to use the land by assigning it to or for the benefit of other Indians, we suggest that Congress should be asked to permit such action by affirmative legislation. We know of no means of accomplishing this by administrative action, particularly over any objections of eligible Mdewakanton Sioux Indians.
Claims Court Remand Decision, 96 Fed.Cl. at 344 (citing Mem. by Charles M. Soller (Dec. 4, 1970)). In the 1970 memorandum, Interior considers whether the land-use restrictions can be set aside, and *1302 offers that the Loyal Mdewakanton are the proper beneficiaries of the land unless Congress acts through legislation. This conclusion of existing binding obligations created by the use restrictions further supports interpreting the use restrictions in the 1888-1890 Appropriations Acts as imposing a money-mandating duty on revenues derived from land purchases.
3. The Special Relationship Between the Government and the Tribes
In my view, recognizing a money-mandating duty in favor of the Loyal Mdewak-anton is further commanded by the special relationship between the United States and the Tribes, as well as by the application of canons of statutory interpretation that resolve language disputes in favor of Tribal groups who, having endured a history of rampant injustice, deserve the fullest protection under the law. See U.S. v. Sioux Nation of Indians, 448 U.S. 371, 423, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) (supporting the Claims Court’s analysis that the 1877 Act embodied an implied obligation of the government to compensate a taking of tribal property set aside for the exclusive use of the Sioux). The Supreme Court recognizes that the relationship between the United States and the Indian people is distinctive, “different from that existing between individuals whether dealing at arm’s length, as trustees and beneficiaries, or otherwise.” U.S. v. Jicarilla Apache Nation, — U.S. -, 131 S.Ct. 2313, 2323, 180 L.Ed.2d 187 (2011) (quoting Klamath and Moadoc Tribes v. United States, 296 U.S. 244, 254, 56 S.Ct. 212, 80 L.Ed. 202 (1935)); see also Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.) (explaining that Indians’ “relation to the United States resembles that of a ward to his guardian”). “Few conquered people in the history of mankind have paid so dearly for their defense of a way of life.” Sioux Nation of Indians, 448 U.S. at 423, 100 S.Ct. 2716 (quoting R. Billington, Introduction, in SOLDIER AND BRAVE XÍV (1963)).
I submit that the government’s unique relationship with the Indian people obligates it to strictly honor the land-use restrictions in the 1888-1890 Appropriations Acts. See Arctic Slope Native Ass’n, Ltd. v. Sebelius, 699 F.3d 1289, 1298 (Fed.Cir.2012) (citing United States v. Mitchell, 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). My view is supported by the entrenched expectation that “statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.” Blatchford v. Native Village of Noatak and Circle Village, 501 U.S. 775, 795, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (internal citations omitted); Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). This canon of construction, dating back to the earliest years of our Nation’s history, is rooted in the unique relationship between the federal government and the Indians, with the understanding that Indians did not wield equal bargaining power when earlier Treaties were negotiated and, as a consequence, doubtful statutory expressions should be resolved in their favor. See Hagen v. Utah, 510 U.S. 399, 423 n. 1, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (collecting cases). With these principles in mind, there is not just a “fair” inference that the 1888-1890 Appropriations Acts are money-mandating, but rather, an unassailable certainty that they are so. The majority resists this conclusion and demands “a more explicit direction from Congress,” fearing that a viable claim under the Acts would impose “a tremendous burden” on Interior given the number of Loyal Mde-wakanton and their varied geographic loca *1303 tions. See Maj. Op. at 1289-90.[5] The standard to establish a waiver under the Indian Tucker Act, however, is not made higher when the case presents “pragmatic considerations.” Id. The Wolfchild plaintiffs only needed to establish, and did establish, that the 1888-1890 Acts can be fairly interpreted to impose a duty on the United States. See White Mountain, 537 U.S. at 480, 123 S.Ct. 1126; Samish, 419 F.3d at 1365.
B. Statute of Limitations
Because I read the claims adjudicated today as falling within the terms of Indian Trust Accounting Statute, the general six-year statute of limitations period would not apply. Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1346-47 (Fed.Cir.2004). I affirm the view of the Claims Court that the statute of limitations did not commence to run on the Wolfchild plaintiffs’ claims until there was an accounting under which the beneficiary could determine whether there has been a loss. Claims Court Remand Decision, 96 Fed.Cl. at 335. For the reasons stated in the Claims Court’s opinion, I depart from the majority and would affirm the conclusion that the Wolfchild plaintiffs’ pursuit of money damages for pre-1980 revenues derived from appropriated lands was timely.
IV. Conclusion
The plain meaning of the statutes, the historical context of the 1888-1890 Appropriations Acts, and the special relationship between the government and the Tribes all weigh against the majority’s conclusion that the Appropriations Acts do not give rise to a money-mandating duty. In denying legitimate claims for compensation under the Indian Tucker Act, the majority loses sight of what the statutes were intended to accomplish at the time of their enactment. For the reasons stated above, I would affirm the Claims Court in finding that the Wolfchild plaintiffs are entitled to litigate and seek judgment against the government for the improper allocation of land revenues set aside for their benefit. Accordingly, I respectfully dissent-in-part.

. The Mdewakanton are known as a band of Minnesota Sioux. I refer to them as the “Loyal Mdewakanton” in recognition of their choice to sever their tribal relationship during the Sioux uprising and remain loyal to the United States by either not participating in the revolt or taking affirmative actions to save the white settlers on the Minnesota frontier. See Wolfchild v. United States, 101 Fed.Cl. 54, 59-60 (Fed.Cl.2011). The plaintiffs, referred to herein as “the Wolfchild plaintiffs,” are approximately 20,750 lineal descendants of the Loyal Mdewakanton. Claims Court Remand Decision, 96 Fed.Cl. at 310.

. In 1980, Congress enacted legislation declaring that the United States would thereafter hold the lands in trust for the three communities. Act of Dec. 19, 1980, Pub.L. No. 96-557, § 1, 94 Stat 3262 ("1980 Act”). There is nothing in the text or legislative history of the 1980 Act that repeals or otherwise overcomes the duty imposed on the United Slates by the 1888-1890 Appropriations Acts.

. For example, in 1862, the Governor of Minnesota, gave a speech to the State Legislature calling for the extermination or total displacement of the Sioux. J.A. 3453 ("The Sioux Indians of Minnesota must be exterminated or driven forever beyond the borders of the State.”); see also J.A. 2387-88 (A New York Times editorial describing the scalping of "red devils” as a "state right" in Minnesota).

. Interior’s recognition of its duty to the descendants of the Mdewakanton Sioux undermines the majority’s contention that any duty to the Loyal Mdewakanton created by statute need not extend to future generations. Maj. Op. 1289 (concluding that the duty would only extend to future generations if Congress included the word “descendants”). Moreover, the language in the land use certificates granting "heirs” of the assignee "exclusive use and possession of said land” is in perfect alignment with the first 1863 Act instructing that the designated land should "be an inheritance to said Indians and their heirs forever.” Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The land use certificates are also consistent with the actual language of the Appropriations Acts, reciting that "families” of the named Loyal Mdewakanton qualified as beneficiaries. 1889 Act, 25 Stat. at 992-93; 1890 Act, 26 Stat. at 349.

. While it may be true that resolution of this case may raise administrative burdens, such burdens should not relieve the government from its own treaty obligations, especially given that the burden has been made more difficult due to the passing of time, a circumstance that the government created and had the power to avoid. It is not in this Court's province to avoid an otherwise just and correct judgment on the grounds that its implementation would impose an administrative burden on the government.