# United States Court of Appeals
# for the Federal Circuit

---

**RAMONA TWO SHIELDS, MARY LOUISE DEFENDER WILSON, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2015-5069

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00090-LB, Judge Lawrence J. Block.

---

Decided: April 27, 2016

---

KENNETH E. MCNEIL, Susman Godfrey LLP, Houston, TX, argued for plaintiffs-appellants. Also represented by SHAWN L. RAYMOND; ANDRES HEALY, Seattle, WA; NANCIE GAIL MARZULLA, Marzulla Law, LLC, Washington, DC.

ROBERT HARRIS OAKLEY, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOHN C. CRUDEN.

---

Before PROST, *Chief Judge,* MOORE and TARANTO, *Circuit Judges.*

PROST, *Chief Judge.*

Appellants Ramona Two Shields and Mary Louise Defender Wilson brought this action against the United States, seeking redress for themselves and other Native Americans in connection with the government's alleged mismanagement of oil-and-gas leases on Indian allotment land. The United States Court of Federal Claims found in favor of the government, granting summary judgment on Count I and dismissing Counts II and III. J.A. 1–30. We affirm.

I

Pursuant to the General Allotment Act of 1887 and the Indian Reorganization Act of 1934, the United States is the trustee of millions of acres of Indian allotment land. The Bureau of Indian Affairs ("BIA"), under the Secretary of the Interior, is the federal bureau responsible for managing the trust lands.

Much of this case turns on events from a prior case, commonly referred to as the *Cobell* litigation. We therefore begin with a discussion of the facts and circumstances surrounding that case.

A

In 1996, the *Cobell* class action lawsuit was filed on behalf of more than 300,000 Native Americans. The plaintiffs alleged that the government had mismanaged their Individual Indian Money ("IIM") accounts by failing to account for billions of dollars relating to leases of allotment land for oil extractions and logging. The litigation was complex and drawn-out, and eventually settled in 2011. *See Cobell v. Salazar*, No. 96-1285, 2011 WL

10676927 (D.D.C. July 27, 2011). It is the details of the *Cobell* settlement that are relevant here.

The *Cobell* settlement provided that, following the enactment of legislation to carry it out, an amended complaint would be filed. The amended complaint set forth several different categories of claims. One was "historical accounting claims" asserted by members of the "historical accounting class"—these claims were closely tied to the government's mismanagement of IIM accounts that was the focus of the original complaint. J.A. 652. Another category of claims was much broader—it included any "land administration claims" held by the "trust administration class," a class defined as including those individuals that held, as of the Record Date of September 30, 2009, "a recorded or other demonstrable ownership interest in land held in trust or restricted status." J.A. 656. The land administration claims were broadly defined as any "known and unknown claims that have been or could have been asserted through the Record Date [of September 30, 2009] for Interior Defendants' alleged breach of trust and fiduciary mismanagement of land, oil, natural gas, mineral, timber, grazing, water and other resources and rights." J.A. 653.

Importantly, the settlement agreement included an opt-out provision. Members of the trust administration class who failed to opt out of the settlement would be "deemed to have released, waived, and forever discharged" the government from any claims falling within the scope of the settlement, including any land administration claims. J.A. 686.

In December of 2010, Congress passed the Claims Resolution Act of 2010, which ratified the settlement and funded it with $3.4 billion. *See* Pub. L. 111-291, 124 Stat. 3064 (Dec. 8, 2010). The amended complaint was duly filed with the district court, the settlement approved, and judgment entered in 2011. *Cobell*, 2011 WL 10676927. In

accordance with the settlement terms, the district court provided notice of the settlement, including class members' opt-out right. The fairness of the opt-out process was challenged in court (including alleged violations of Fifth Amendment due process and the notice provisions of Fed. R. Civ. Pro. 23), but those challenges were ultimately rejected. *See id.*, *aff'd*, 679 F.3d 909 (D.C. Cir. 2012), *cert denied*, 133 S. Ct. 543 (2012).

B

Appellants in this case, Ms. Two Shields and Ms. Defender Wilson, are "Indian allotees" who hold interests in allotment land located on the Fort Berthold Indian Reservation in North Dakota. Appellants' allotments are located on part of the Bakken Oil Shale—one of the country's largest contiguous deposits of oil and natural gas.

Pursuant to legislation enacted in 1998, Fort Berthold allotees cannot lease their oil-and-gas interests unless the Secretary approves the lease as "in the best interest of the Indian owners of the Indian Land." Pub. L. No. 105-188, 122 Stat. 620 (1998) ("Fort Berthold Act") (amending 25 U.S.C. § 396). This approval step is "intended to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes [the Indian owners'] best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." 25 C.F.R. § 212.1(a).

In 2013, Appellants sued the government for violating its obligations relating to approval of oil-and-gas leases on Fort Berthold allotment lands. Appellants alleged that, between 2006 and late 2009, a company called Dakota-3 obtained leases on thousands of acres of Fort Berthold allotment land at below-market rates, then turned around and sold those leases to the Williams Companies in November of 2010 for a profit of nearly $900 million. Appel-

lants alleged that the BIA knew the below-market rates were not in the Indian owners' best interests, but nonetheless rubber-stamped every Dakota-3 lease.

The complaint contained three counts. The primary one, Count I, alleged that the BIA breached its fiduciary duty under 25 U.S.C. § 396 to ensure leases are in the best interests of the Indian owners. The government sought summary judgment on this count, arguing that Appellants were barred from asserting it by the *Cobell* settlement. It is undisputed that Ms. Two Shields and Ms. Defender Wilson are members of the trust administration class and that they failed to opt out of the settlement.[1] The government therefore argued that it was entitled to summary judgment because Count I was a land administration claim released by Appellants' failure to opt out of the *Cobell* settlement. The Court of Federal Claims agreed, granting summary judgment for the government. J.A. 14–21.

The complaint's Counts II and III were made in the alternative. In Count II, Appellants alleged that the government breached a wholly separate fiduciary duty—a duty to have disclosed to Appellants, during the *Cobell* settlement proceedings, information relating to the Fort Berthold claims Appellants assert in this case. The Court of Federal Claims dismissed this count for lack of subject matter jurisdiction, agreeing with the government that there was no source of federal law that set forth the specific fiduciary duty alleged to be breached. J.A. 25–27. In Count III, Appellants alleged that the Claims Resolution Act of 2010 was a legislative taking of Counts I and

---

[1] While Appellants refused to concede that they were members of the trust administration class below, the Court of Federal Claims made a finding that they were members of the class, and Appellants do not dispute that finding on appeal.

II, in violation of the Fifth Amendment. The Court of Federal Claims dismissed this count as well, finding that Counts I and II did not amount to a cognizable property interest that could be the subject of a takings claim because they lacked a final judgment; that Appellants could not show an unjust taking occurred; and that, in any event, Count III appeared to be a due process claim "masquerading" as a takings claim, and therefore outside the Court of Federal Claims' jurisdiction. J.A. 27–29.

Appellants now appeal to us. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II

We review a summary judgment determination by the Court of Federal Claims "completely and independently, construing the facts in the light most favorable to the non-moving party." *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed. Cir. 2000). We review de novo the Court of Federal Claims' dismissals based on lack of jurisdiction, *Holmes v. United States*, 657 F.3d 1301, 1309 (Fed. Cir. 2011), and failure to state a claim for which relief can be granted, *Hartford Fire Insurance Co. v. United States*, 772 F.3d 1281, 1284 (Fed. Cir. 2014).

## A

We begin with what both parties agree is the primary question in this case: whether the *Cobell* settlement bars Appellants from now asserting Count I against the government. We treat the *Cobell* settlement as a contract, *VanDesande v. United States*, 673 F.3d 1342, 1350 (Fed. Cir. 2012), the proper interpretation of which is a question of law, *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1373 (Fed. Cir. 2001). Appellants offer four reasons why the *Cobell* settlement should not be interpreted as releasing their claims. We take each in turn.

First, Appellants argue that Count I does not fall within the definition of "land administration claims,"

which is limited to only those claims that could have been asserted by the Record Date of September 30, 2009. Appellants contend that the crucial event in this case was the November 2010 sale of leases from Dakota-3 to the Williams Companies, at a profit—that Appellants' claims did not accrue until that time and thus do not meet the September 30, 2009 cut-off date for "land administration claims."

Appellants are correct that "a claim does not accrue until all events necessary to fix the liability of the defendant have occurred." *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993). But the November 2010 sale to the Williams Companies was not an event necessary to fix the government's purported liability. Instead, "[a] cause of action for breach of trust traditionally accrues when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation." *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004). "A trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as a trustee." *Id.* Here, the government's purported liability was fixed at the time it allegedly repudiated its trust duties as set forth in § 396—when it approved the Dakota-3 leases at below-market rates. Appellants do not argue that they lacked knowledge of the below-market rates at the time of approval, nor do they argue that any of the approvals occurred after the September 30, 2009 cut-off date. Thus, although the November 2010 sale to the Williams Companies was, in some sense, a final link in the chain, Appellants' claims had accrued, and could have been asserted, back when the BIA approved the below-market Dakota-3 leases. Count I therefore is a "land administration claim" settled by *Cobell*—it comprises "known and unknown claims that have been or could have been asserted through the Record Date [of September 30, 2009]."

Second, Appellants argue that the *Cobell* settlement's payment mechanics show that Count I was not released. The *Cobell* settlement provided that each member of the trust administration class would receive a base payment of approximately $800, plus an additional pro rata payment based on the amount of money deposited in the member's IIM account from October 1, 1985, through September 30, 2009. Appellants argue that these payments "make[] no sense" as applied to the present case: that individuals received an average of only $1,600 under the *Cobell* settlement while they stand to receive anywhere from $100,000 to $150,000, if successful in this case. Opening Br. 30. Appellants argue that invoking *Cobell's* release language in these circumstances would mean that Appellants "waived their claims *for nothing*." *Id.* at 31.

Appellants' argument is foreclosed by the simple fact that they chose not to opt out of the settlement. Even if the *Cobell* payments are less than satisfactory in rectifying the Fort Berthold harm, Appellants are bound by the settlement's payment terms because they chose not to opt out. Further, challenges to the fairness and adequacy of the *Cobell* payment scheme have already been rejected. In 2012, the United States Court of Appeals for the District of Columbia considered an argument that the *Cobell* settlement's distribution scheme was unfair because some class members "likely possess more valuable claims than do others and . . . the *per capita* baseline payment undercompensates the former while over-compensating the latter, an inequity that the *pro rata* payment does not remedy." *Cobell v. Salazar*, 679 F.3d at 918–19. The court rejected this argument and closed the issue, stating that "the distribution scheme is fair and '[i]t is hard to see how there [c]ould be a better result.'" *Id.* at 919 (citation omitted). The court further reasoned that "the existence of the opt-out alternative effectively negates any inference

that those who did not exercise that option considered the settlement unfair." *Id.* at 920. We agree.

Third, Appellants argue that the *Cobell* settlement should not be construed as releasing the government's liability for Count I because the government failed to provide "full information" about Appellants' claims (e.g., details regarding the specific damages and breaches relating to the Fort Berthold allegations) back when the *Cobell* release was effectuated. As support for its "full disclosure" theory, Appellants rely on a 2003 decision from the Court of Federal Claims, *Shoshone Indian Tribe v. United States*, 58 Fed. Cl. 542 (2003).

The *Shoshone* case does not stand for the broad-sweeping proposition made by Appellants. At issue in that case was the government's motion in limine to exclude evidence based on a letter sent by the Indian plaintiffs, which the government argued constituted a release of the plaintiffs' claims. *Id.* at 544. The Court of Federal Claims denied the government's motion to exclude. Relying on a general treatise on trusts, the court found that no release occurred because the government had not provided plaintiffs "with the full information plaintiffs would have needed before releasing the claims listed in the 1997 letter." *Id.* at 545. This decision is not controlling here. First, we are not bound by decisions of the Court of Federal Claims. Second, as explained later in this opinion, more recent cases from the Supreme Court make clear that a general trust relationship between the United States and its beneficiary is not enough to impose an information-disclosure obligation found nowhere in the governing statute. *See infra* pp. 12–14.

Finally, Appellants argue that the named *Cobell* plaintiffs lacked standing to assert Appellants' Count I Fort Berthold claims. The *Cobell* settlement releases any claims "that were, or should have been, asserted in the Amended Complaint when it was filed." J.A. 686. Appel-

lants point out that the named *Cobell* plaintiffs had no Fort Berthold oil-and-gas interests and the *Cobell* complaint did not contain a single fact regarding the specific Fort Berthold claims. They contend that the named *Cobell* plaintiffs lacked standing to assert Appellants' Count I Fort Berthold claims because the "alignment of interest and injury must be exact" as between class representatives and the other class members. Opening Br. 35.

Appellants are incorrect that *exact* alignment of injury is required between class representatives and other class members. *Id.* The question, instead, is whether or not the claims of the class representatives and other class members "implicate a significantly different set of concerns." *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003).

Here, it is clear that the concerns implicated by the *Cobell* claims and Appellants' Count I claims are not significantly different. Appellants assert in this case that the BIA approved leases that were below market value, and therefore were not in their "best interests" as required by the Fort Berthold Act. Those concerns are precisely the same as the ones implicated by *Cobell's* land administration claims, which specifically included any alleged "[f]ailure to obtain fair market value on leases" and "failure to prudently negotiate leases" by the Secretary on Indian allotment land. J.A. 654. The fact that the named *Cobell* plaintiffs' oil-and-gas interests may have been tied to a location other than Fort Berthold is of no moment—the alleged harm in both *Cobell* and this case is not significantly different. Likewise, the fact that the *Cobell* complaint did not specifically reference the Fort Berthold Act is also insignificant, as the "best interest" standard of the Fort Berthold Act adds little to the language already present in § 396. *See* 25 U.S.C. § 396 ("The Secretary of the Interior shall have the right to reject all bids [for mineral leases] whenever in his judgment the interests of the Indians will be served by so doing, and to advertise such lease for sale."). There is no standing issue

that precludes application of the *Cobell* release to Appellants' Count I claims.

For the aforementioned reasons, we reject all four of Appellants' arguments as to why the Court of Federal Claims was wrong to construe the *Cobell* settlement as releasing their claims.

We also reject Appellants' contention that the Court of Federal Claims erred by arriving at its conclusion without first allowing discovery of extrinsic evidence regarding the facts and circumstances surrounding the negotiation and execution of the *Cobell* settlement. Appellants' position is that this extrinsic context evidence must be considered in determining whether the *Cobell* release language applies to Appellants' Count I claims. We disagree.

"Outside evidence may not be brought in to create an ambiguity where the language is clear." *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994); *see also R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed. Cir. 1990). Although we have noted that evidence of "trade practice and custom" should be considered when interpreting contracts, that is not the type of evidence Appellants seek to rely on here and, in any event, even that type of evidence cannot be used "to create an ambiguity where a contract was not reasonably susceptible of different interpretations at the time of contracting." *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999); *see also id.* (warning against "according undue weight to [a] party's purely *post hoc* explanations for its conduct"). Likewise, this is not a case where the court below erroneously relied on a general dictionary definition to ascertain the meaning of a contract, divorced from the context of the agreement. *See Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1340–41 (Fed. Cir. 2013). Here, the language of the *Cobell* settlement is clear. As explained above, Appellants have failed to show any reason why Count I is

not barred by its terms. We therefore affirm the Court of Federal Claims' grant of summary judgment.

B

Appellants' Count II alleges that, even if Count I is barred by *Cobell*, the government breached a wholly separate fiduciary duty—a duty to have disclosed to Appellants, during the *Cobell* settlement proceedings, information relating to the Fort Berthold claims Appellants assert in this case. Appellants rely on 25 U.S.C. § 396 and its regulations as supplying the requisite statutory authority for this fiduciary duty. The Court of Federal Claims dismissed Count II for lack of jurisdiction, finding that § 396 does not supply the fiduciary duty alleged to be breached. We agree.

Both the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505, create subject matter jurisdiction for the Court of Federal Claims over certain claims brought against the United States. There are "two hurdles that must be cleared" before jurisdiction can be invoked pursuant to these statutes. *United States v. Navajo Nation*, 556 U.S. 287, 291 (2009). "First, the tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" *Id.* (quoting *United States v. Navajo Nation*, 537 U.S. 488, 490 (2003) (*Navajo Nation I*)). If that threshold is passed, the court must then determine whether the relevant source of substantive law can be fairly interpreted as a money-mandating. *Id.*

Appellants' Count II fails at the first hurdle. When determining whether the government owes a particular fiduciary duty, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo Nation I*, 537 U.S. at 506. Although common-law principles can be used to inform the scope of liability that Congress has imposed, *United States v.*

*White Mountain Apache Tribe*, 537 U.S. 465, 475–76 (2003), "'a general trust relationship between the United States and the Indian People' . . . alone is insufficient to support jurisdiction under the Indian Tucker Act." *Navajo Nation I*, 537 U.S. at 506 (quoting *United States v. Mitchell*, 463 U.S. 206, 225 (1983)). Rather, "the United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015).

The Supreme Court has found that some "statutes and regulations . . . clearly establish fiduciary obligations of the Government." *Mitchell*, 463 U.S. at 226; *id.* at 220 (finding specific fiduciary duties of timber management in light of a statutory and regulatory scheme creating obligations on "virtually every aspect of forest management"); *see also White Mountain Apache Tribe*, 537 U.S. at 475 (finding specific fiduciary duties to maintain and preserve property that is "actually administer[ed]" in trust). But where the relevant statute cannot be fairly read as imposing the specific fiduciary duty alleged to be breached, the Court has refused to impose the obligation on the government. *See Navajo Nation I*, 537 U.S. at 507–13 (finding no specific fiduciary duties to ensure a specific rate of return on coal leases or to proscribe ex parte communications in an administrative appeal process); *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2329–30 (2011) (finding no specific fiduciary duty to disclose all information related to the administration of Indian trusts); *see also Hopi Tribe*, 782 F.3d at 668–71 (finding no specific fiduciary duty to ensure adequate water quality on the Hopi reservation).

Appellants here rely on 25 U.S.C. § 396 as creating a very specific fiduciary duty of the government—a duty to have "disclose[d] 'full information' to Two Shields or their counsel about their § 396 claims before securing their release." Reply Br. 23. But nothing in § 396 imposes such an obligation. Section 396 is directed to the lease of

Indian allotment land for mining purposes; it states that the Secretary "is authorized to perform any and all acts and make such rules and regulations as may be necessary" and gives to the Secretary "the right to reject all bids whenever in his judgment the interests of the Indians will be served by so doing." 25 U.S.C. § 396. The Fort Berthold Act further obliges the Secretary to approve only those leases that it has determined to be "in the best interest of the Indian owners of the Indian land." Fort Berthold Act, § 1(a)(2)(A)(ii). The obligations imposed on the Secretary relate solely to the approval of mineral leases on allotted land; nothing in the statute creates litigation-related disclosure obligations, and certainly not the specific *Cobell* settlement disclosure obligations sought by Appellants in this case. Like the Supreme Court in *Jicarilla*, we conclude that the relied-upon statute here does not include a general duty "to disclose all information related to the administration of Indian trusts." *Jicarilla*, 564 U.S. at 2330. Because Appellants point to no other source of law providing the fiduciary duty alleged to be breached, we affirm the Court of Federal Claims' dismissal of Count II.

C

Finally, in Count III, Appellants allege that if their Counts I and II fail, the Claims Resolution Act of 2010 was a legislative taking of Counts I and II without just compensation, in violation of the Takings Clause of the Fifth Amendment. The Court of Federal Claims dismissed Count III for failure to state a claim. We agree with the dismissal, but not for the reasons relied on by the court.

We assume here, contrary to the Court of Federal Claims, J.A. 28, that Counts I and II constitute property protected by the Takings Clause. And we apply the requirements of the Takings Clause—the only Clause invoked by Count III and invoked by Appellants here—

without re-characterizing the claim as a due process claim. *Cf.* J.A. 28–29. We conclude that no taking occurred here.

The Claims Resolution Act of 2010 ratified the *Cobell* settlement agreement. That settlement gave Appellants and other *Cobell* class members two options: accept the settlement terms and agree to releasing all covered claims against the government, or opt out of the settlement and retain the ability to pursue covered claims against the government. The choice was up to Appellants—they could give up their claims against the government, or they could retain them. By failing to exercise their opt-out right, Appellants voluntarily chose to forfeit their claims against the government—including Counts II and III. In these circumstances, no unjust taking occurred.

Our sister circuit has reached the same conclusion in similar circumstances. *See Littlewolf v. Lugan*, 877 F.2d 1058 (D.C. Cir. 1989). In *Littlewolf*, the D.C. Circuit rejected an argument by tribe members that the White Earth Reservation Land Settlement Act of 1985 was an unconstitutional taking in violation of the Fifth Amendment. *Id.* at 1059. That Act extinguished the Indians' claims to land illegally transferred earlier in the century in return for payment of compensation based on the fair market value at the time of transfer plus five percent interest. *Id.* As an alternative to the statutory compensation, the Act also gave claimants the option of filing an action for judicially-determined compensation within six months of the issuance of the notice of the payment due them, in which case they would forgo their statutory compensation. *Id.* The D.C. Circuit affirmed the district court's determination that no unjust taking occurred in those circumstances because "a Tucker Act 'safety net' suffices when 'a statute's "basic compensation scheme . . . is valid but could result in payment of less than the constitutional minimum."'" *Id.* at 1065 (quoting *Littlewolf v. Hodel*, 681 F. Supp. 929, 946 (D.D.C. 1988) (quoting

*Regional Rail Reorganization Act Cases*, 419 U.S. 102, 150 (1974))).  In other words, as the district court in that case put it, "[t]here is not taking" when "those affected are afforded a reasonable opportunity to bring suit."  *Little-wolf v. Hodel*, 681 F. Supp. at 944 (citing *Texaco v. Short*, 454 U.S. 516, 531–32 (1982), *Block v. N. Dakota*, 461 U.S. 273, 286 n.23 (1983), and *Keller v. Dravo Corp.*, 441 F.2d 1239, 1242 (5th Cir. 1971), *cert denied*, 404 U.S. 1017 (1972)).  The same rationale applies here.

The decision of the Court of Federal Claims is af-firmed.

## AFFIRMED